Hopefully we saved the best for last, and we'll call the case 17-20802, YPF v. Apache Overseas. And Ms. Ho, we'll hear from you. Thank you, Your Honor. May it please the Court. My name is Yvonne Ho, and I represent the appellants, the Apache entities in this case. Because arbitration is a matter of contract, parties are entitled to bargain for and mutually agree on the procedures that will govern their arbitration proceedings. And when the arbitrators fail to comply with those bargain-for procedures, they exceed their powers under the FAA. And here's — So it wasn't the contract that KPMG would handle it, and then you all did a subsequent contract to have the two arbitrators? That's right. Initially, we entered into a sales purchase agreement with the Schedule 9 indicating the independent accountants would handle arbitration proceedings. And then when the dispute arose, the parties then engaged in an extensive negotiation process. And during that process, they chose which specific individuals they wanted as arbitrators. In that process, they chose one arbitrator from KPMG's United States office, and that was Ms. Ginger Manown. And then they also chose an arbitrator from KPMG's Argentina office, which is where YPF is based, and that's Mr. Diego Bledger. And in doing so, they executed the engagement letter in 2016, in which they stated very clearly that the engagement and the determination shall be made by Ms. Manown and Mr. Bledger. So let me ask you about that. So I've got the engagement letter in front of me. I think it's a February 11, 2016 engagement letter. That's correct. Is the relevant sentence here at the bottom of the first page, and I'm reading it, it's under the section called scope of dispute. It says the determination will be a joint determination by Ginger Manown and Diego Bledger. Is that the important sentence? That's part of it. That mentions the joint determination. Determination is a defined term to mean the decision. So that's a defined term, the determination. Determination, yes. The decision. Yes. So if I look at the letter that was sent on October the 5th, 2016, that says re, colon, determination of the disputed amounts. That's the decision. That is the determination, yes. That's the decision. So then I guess the argument would be, well, then you got what you bargained for, right? You got a determination by those two partners. And what's wrong with that? We received partly what we bargained for. We haven't finished out the process the parties agreed to. And that's because on R08988, in footnote 2, the parties very clearly specified that the engagement and the determination shall be made by Ms. Manown and Mr. Bledger. Okay. But you have the problem, and this comes up in AAA arbitrations, where something wasn't anticipated. It wasn't anticipated that Ms. Manown might leave. And therefore, it wasn't addressed. I mean, if there was a provision that said if Ms. Manown leaves, then we have to all make a different case. But in that circumstance, normally you defer to the sort of arbitration entity. Normally it's the AAA or somebody like that. Here it's the KPMG. So why wouldn't we defer to them to handle the situation that was not addressed in the contract? Well, what we did specifically address is exactly which two arbitrators we wanted for the entire engagement. And there's only two of those two individuals. That's no longer possible. So what I'm saying is your contract doesn't say we start over at that point. So KPMG did something logical and rational. They picked another KPMG person to finish out the last little bit about the issue of whether the addition and calculation was proper. Why isn't that exactly what AAA does all the time in arbitrations, all the time when something comes up that wasn't contemplated in the arbitration agreement and they resolve it? Well, because this Court's own precedent shows that even if the parties bargain for a process that is completely unworkable, that process must be followed. Talking about the Poole-Wray case? Poole-Wray is a great example because there the parties expressly bargained for the arbitrator to be chosen by the Guilin BWI director of insurance. Well, it turns out there was no such person. And so the request got sent to some other Guilin official who purely rationally said, well, I'm just going to dozen an arbitrator because I'm probably the closest thing to the director of insurance. And yet the district court vacated the award and this Court upheld the decision because even if it's unworkable, it still doesn't justify an arbitrator straying from the terms of the contract. And there's an easy remedy for this. What should have happened is that KPMG, upon Ginger Manown's departure, and if she truly were unavailable to complete the process she agreed to, then they should have just come to us. We mutually agreed to Ms. Manown and Mr. Bleger in the first place. And under basic contract principles, the solution is for us to mutually agree to a replacement. It's just a simple contract modification. But you didn't bargain for that process that you just articulated, did you? Well, we specifically bargained for these individuals. And as a result to replace them in the event of an unforeseen circumstance. That's right. We bargained for something that went beyond just the method of appointing arbitrators. We left no doubt that only these arbitrators were authorized to resolve the case. I guess my point is, but my point is you didn't bargain. When I say you didn't bargain for it, it doesn't appear in a written document a process for replacing one of the arbitrators in the event of an unforeseen circumstance. No. And that's true also in Pooray. They didn't bargain for an alternative if it turns out that the Anguillin Director of Insurance couldn't be involved. Is there anything in the agreement or the engagement letter regarding replacement of KPMG itself? What would happen if KPMG, something happened that KPMG could no longer act as the independent accountant? Is there anything in the agreement about a process for replacing the accountant? No. And again, because we chose those individuals at KPMG, if for some reason KPMG disappeared or those accountants disappeared, then, again, we would have to go back to the drawing board and pick up. What does that mean, going back to the drawing board? I mean, let's stipulate that you have an actionable defect in the process. Does that mean revisiting the five-day rehearing or revisiting the entire thing? No. We just need to pick up exactly where Ms. Monell left off. She — we don't dispute that she and Belaguer issued the determination. We have issues — we have problems with the determination in its failure to disclose sufficient reasoning, but there was a determination issued. What we need to do is to go back and pick a substitute arbitrator, assuming Monell is not available. Just for the five days. Just for — to finish out this process, because under the party's mutual agreement, unless and until those post-determination objections are properly resolved, the award by definition is not final and binding. And so we need to pick up where the determination leaves off, have a proper resolution of our objections. I'm just curious. Why does your client care? I mean, if all this is, is you're not going to undo the entire determination. All you're doing is appointing somebody else to determine whether or not there was a patent arithmetical inaccuracy submitted. You know, this is expensive appeal, I assume, for your client to be undertaking. What do they get out of this? I'm just purely curious. Well, it's because the process — this is an agonizing process trying to come to this arbitration agreement in the first place. And the party spent a lot of time deliberating over who they wanted as their arbitrators. We had no idea that Magenta Ramal was going to just punch out altogether. And in fact, you know, at the time she notified the parties that she was going to be leaving KPMG, we impressed upon them that this could be a serious problem for engagement, and yet she came back and affirmatively reassured us that she would stay involved. And so the choice of decisionmaker goes to — And somebody new is appointed to fill out this 5-day process, jointly agreed upon by both sides. So the defect's cured. I presume it's going to be the same result. You just want to make sure the paperwork's been done correctly? Well, it may well be. But the party's choice of arbitrator goes to the very heart of what they bargained for. I mean — I know, but you're not — your client's not here to litigate fine points of law. Your client's here to make or lose — you know, to make money. Well, it — You just — your client just wants the dot — the i's dotted and the t's crossed. To ensure that the party's mutual agreement is followed. Obviously, you think there might be a different outcome or you wouldn't be here. I mean, I don't know why you won't just say that. Well, we don't know. If there would not be a different outcome, then this is just a complete waste of everybody's time and money. And I can't believe that that's what you would be here for. Yeah. Just to echo that, I mean, in the Poole Ray case, we said a trivial departure from the selection method of arbitrators may not warrant vacatur. I mean, if there's no chance of a different outcome, then why isn't a trivial departure to have a different accountant to deal with the sort of cleanup at the back end? Well, certainly, by mutual agreement, this is not trivial, because the process itself needs to be properly completed. Otherwise, by definition, there is no final and binding determination that could ever be confirmed. Is the term engagement defined anywhere in the agreement? No. And so it's given — under subtle laws, it's given its plain meaning. And the word engagement is set out separately from the word determination, which is a defined term. In the footnote that you — that's footnote 2 in the — just so I can understand. I know you gave me a record site and I appreciate that. But you said it was footnote 2 in the — That's right. Engagement letter. That's right. And so by stating that Manown and Blago shall be responsible for both the engagement and the determination, just being involved in determination is enough, because it did not conclude the engagement, because we specifically established and mutually agreed to a post-determination process for resolving objections. And so ultimately, we — A little different from Pouret in the sense that you have this underlying arbitration contract that's got KPMG involved and defers to KPMG. I mean, isn't that a piece that allows for the process that occurred that's different from just we named a nonexistent entity so we've got to start over? No, because we didn't allow KPMG — we didn't authorize KPMG to override our express choice of which two arbitrators would handle the engagement. I mean, even — But they're not overriding it. They're honoring the fact that Manown just took off, as you said. And, I mean — Well, that's right. It took somebody to do something. And because we mutually agreed to Manown, we would — we would need to mutually agree to replacement. And if for some reason that weren't possible, all that we need to do is invoke FAA Section 5 and go back to a court and have the court appoint a substitute arbitrator. So it certainly is not an — it's not an insurmountable obstacle to confirming a particular award. Would you acknowledge that patent arithmetical inaccuracy means you can't challenge substantive reasoning of the determination? I think that's right. It needs to basically pertain to math. The problem here is we didn't get any figures that inform the end results that are listed in the chart in the determination. Anything in the agreement or the engagement letter that required them to give you figures explicitly? No. I think that's a result of reading the two pertinent provisions of the contract together. Did you not bargain for a reasoned determination? We bargained for reasoning supporting the determination, but then we went on to confer a right to the parties to challenge any patent arithmetical inaccuracies in determination. So for that challenge process to have any meaning, there has to be at least enough information for us to ascertain what numerical inputs the arbitrators use in arriving at their figures. And I think it's significant that as to these figures, which are on page 966 of the record, there are nine categories listed, and there are four of them that neither party disputed. So we can just take those off the table. So of the remaining five categories, however, the arbitrator refused to award the amounts sought by either party for four of them. And we have no idea what numbers informed these particular end results. And it's significant because if you add those up, it's over $8 million of the $9.8 million award. And so for us to challenge math, the arbitrators have to show their math. Otherwise, our ability to challenge their math is thwarted, which is what happened. I'm not sure why they have to show the math. Pardon? I'm not sure why they have to show the math. Am I correct in understanding your argument on this second point rests on the word reasoning? It rests on reasoning and the ability to challenge patent arithmetical inaccuracies in the determination. So the reason needs to be sufficient. Is there any reason to suspect that when they went back after you raised that, that they didn't check the math? I mean, Blager was involved. He's your guy. You all agreed on him. He goes back and checks the math. I mean, I understand math errors. But typically, once you're aware that somebody's challenging your math, you go one plus two, oh, we put four. Oh, no, it should have been three. Or not, right? I don't understand. This isn't something like judgmental. It's math. So that's what I'm trying to understand about the math. Well, based on the ruling that was issued, they didn't even address the math concern. We objected to the fact that we don't know their underlying figures. And all they said was, oh, your objection is substantive tonight. And it was done by we have no idea. So I wanted specifically to raise the section I was alluding to earlier, Schedule 9 of the SBA, which says in the absence of an agreement between the parties, KPMG, it references KPMG shall be entitled to determine the procedure be followed. So why isn't this that situation? You all didn't agree on what to do if Menon just took off, so KPMG steps in and does it. As I said, typical AAA kind of scenario except that KPMG is the entity. Our position, that is just a gap filler. So there really isn't a gap to fill if the parties go beyond just saying how we're going to go appoint arbitrators. They specify the only two people that are authorized and empowered to resolve the engagement. And any deviation from that express term means that we have a gap. We have an unanticipated gap, which is that Menon left and apparently isn't interested in being involved anymore. But it's the same sort of situation as Poole Ray, as a BP? No, because in Poole Ray they didn't have an entity that they referenced and said they could go to them. I mean, here the entity they referenced didn't exist, so that didn't help us. So if KPMG didn't exist, it would be analogous. Well, it's been analogous in BP as well. The parties established a process, and the district court fairly said, well, this process doesn't work when you have a multiparty dispute. And even in that circumstance, this Court held the parties to their bargain and said you can't modify what the parties have established as the fundamental procedure for the arbitration. Here we've chosen those two people by mutual agreement. If one of those persons is no longer available, then the only solution is for us to mutually agree to a replacement. And barring that, to seek relief from a district court under FAA Section 5. Is there a difference between substantive reasoning and arithmetical computation? Substantive reasoning, I'm sure, could be interpreted in different ways. But arithmetical, seriously, is literally about math. So unless we know what numbers people added, subtracted, there's no ways to know whether the math was correct. And so we need to know. I mean, reasoning could be tell me the methodology that you used, right? One side wants this type of thing counted. The other side says, no, that's wrong. We should use a different formula. That seems to me different, because you're hanging your hook on reasoning and arithmetical inaccuracy. But it seems to me that actually could cut against you, in that it doesn't require arithmetical computation. It requires reasoning. And obviously the drafters of this knew how to talk about arithmetical issues, because it talks about it in the very next paragraph. I do think that reasoning to ascertain arithmetical errors means at minimum, we need to know the proof. That's not what it says. It doesn't say reasoning with respect to the math. It just says reasoning. Yes. It says reasoning underlines the determination. Right. And then it says we have a right to challenge math errors in the determination. Right. So why do you read the second? I'm sorry about the time. Why do you necessarily read the second to deal with the first? It seems to me that these are just two separate concepts. Tell me your methodological reasoning, and then we'll tell you later on, okay, I'm not going to challenge your methodological reasoning, but I do now have a math problem. No, I don't think that in order for the ability to challenge math to have any meaning, there needs to be at least a disclosure, i.e., reasoning, to show what mathematical inputs the arbitrators used. Why just describe the formula? Pardon? Just describe the methodology that you used. You don't have to do the math. Well, math necessarily involves computation. And certainly, YPF cites sections, and the Court can certainly see the reasons offered by the arbitrators don't shed any light on the actual numerical results, the outputs listed in the chart on page 96. If they add 1 plus 1 and get 3, that's your reason. Right. The Supreme Court can establish a legal standard, and it's up to a lower court, us or a district court, to figure out how to apply it to a certain set of facts. I'm not sure why these two things have to map onto each other. Well, I think the way the parties structured their agreement means that there has to be a disclosure to effectuate the right. Otherwise, the right to challenge math wouldn't really have any meaning in the contract.  Thank you. You saved time for rebuttal. Thank you. Mr. Stone. Please, the Court. Good morning, Your Honors. I'm Alan Stone. I'm here on behalf of the appellees, the YPF entities. How do you distinguish Poiret? Well, Poiret was a case where there was a specific agreement to have a particular person holding a particular office be the arbitrator. And so there was an intention expressed by the parties to have that person do it. That person, it turned out, did not exist. They say that's exactly this case. That's not this case. We got two people. They didn't complete the deal. One of them left. Same deal. Totally different, Your Honor. And the reason is that, first of all, KPMG was the arbitrator here. There was a subsequent agreement that indicated that these two partners, Manown and Blager, would be the persons who issued the determination. But ultimately, the party appointed by the arbitration clause here was KPMG. So that's the first thing. The second thing is, this is not a case where there was a specific provision providing for something that was not honored. Here we have a situation where it's the unprovided-for case. In other words, there is no provision that they can point to in any of these contracts, meaning the SPA, Schedule 9, or the engagement letter that we violated in any way. Well, they point to footnote 2 in the engagement letter that says, quote, this engagement and the determination shall be done in this manner. Right. And what's your reaction to that argument? My reaction to that one, Your Honor, is engagement, as Your Honor pointed out in previous questioning, is not a defined term. The plain meaning of footnote 2, if you read the entire footnote, is really simply to say that Manown and Blager are the ones leading this project, and any disputes between the two of them were to be resolved by KPMG, which is very consistent, of course, with the section in Schedule 9 that says that in the unprovided-for case, it's up to KPMG to determine what the process is. We also know by your use of footnote 2, because I don't want to put words in your mouth, are you saying that what happened here is a disagreement between Manown and Blager? We are saying it's analogous to a disagreement. In other words, obviously, she was no longer there, so they couldn't disagree on anything, but this is the most analogous provision in the contract. We recognize it doesn't address a vacancy directly, but it's certainly analogous. Would it be a big deal to you all just to simply get somebody else, since there seems to be at least a technical, literal defect here? It would be a big deal, Your Honor. This transaction happened in 2014. It only takes five days to process. It was issued in 2016. We won. Maybe not five days. It's not going to take long for two people to decide, was this a patent? That is true, Your Honor, but we believe that we prevailed in this arbitration, that it was designed to be a quick, efficient process, and we've been deprived of that, and we don't need to go back on anything. In addition, I would say, Your Honor. I get that you'd rather not do it. I get that. I'm just curious. Is this a real burden on you all, other than a few more days, a few more weeks? No. I can't say that would be a burden, Your Honor. But I will also say that there really was nothing more for Ms. Manown to do, even had she been around. And the reason for that is that there was never a proper objection lodged. So a proper objection would have been something that said, we think you have your math wrong. That was never lodged. They don't even defend that. They've never asserted that the objection that they lodged was proper, and therefore KPMG didn't need to do anything. We don't need anybody, and the stuff that this extra person did was irrelevant. Irrelevant. It's final and binding after five days. To be clear, I assume you would agree you do need somebody to determine that this is not an alleged patent mathematical, arithmetical inaccuracy. It may be an easy call in this case, but somebody does have to make that call. I think that someone at KPMG had to look at the letter and decide whether it was a proper or improper objection. I agree with that, Your Honor. Well, that's kind of interesting because if it's not a proper objection, then we would never get to this whole issue of this other guy. But how do you get to this question of whether it's proper or improper if you don't have the other guy? So cart or horse? Which one is the cart and which one is the horse in this case? Right. And I think that that is answered by the general case law that certainly is very strong in this circuit that says that in reviewing court, examining whether arbitrators exceeded their powers must resolve all doubts in favor of arbitration. I vote for the arbitration. Yes. So would that be true also of the Schedule IX section that I read, that if there's a doubt about whether that is in play in a situation like this, we should defer to the remedy that supports the arbitration result? I agree with that, Your Honor, but I don't think there's any doubt about that provision in Schedule IX applying here. This is the unprovided for case. Clearly, both in the case of — And that's different from Poole Ray. That is different than Poole Ray. And that's true not only of the vacancy created by Manow and Levy. It is also true with respect to the issue of the reasoned opinion. The case law in this circuit is very clear that the reasoned opinion is somewhere between a simple determination, which says this is the result, and findings of fact and conclusions of law, which are very, very detailed. And the case law says that the courts give great deference and don't require much more than a simple determination to find that it's a reasoned determination. But importantly, this is another situation where it was unprovided for. There was not anything specifically in the SPA, in Schedule IX, or in the KPMG engagement letter that said what that reasoning must be. And I think the Rain II v. ConocoPhillips case has some language that is spot on that I think applies here. And there the court, and I'm reading from 674 F. 3rd, 474. The court says, as stated in green, if Conoco wanted a more thorough discussion of why the arbitrator reached the decision he did, it could have contracted for an award to include findings of fact and conclusions of law. Instead, the parties agreed to a reasoned award, which, according to our case law, is more than a simple result. I think, Your Honor, I've covered everything that I need to. Okay. Thank you. Thank you. I appreciate your argument. And we will now hear rebuttal from Ms. Ho. Just a couple of brief points. On the selection of arbitrators, counsel for YPF emphasizes this other language in the footnotes. What they fail to recognize is the placement of this footnote, which I think is legally significant. It expressly qualifies other language in the engagement letter stating that Manown and Blager can consult with or direct other KPMG employees. And by dropping this footnote, it says, in effect, that despite their ability to talk with or draw in other KPMG employees in some capacity to help, the buck still stops with Manown and Blager. So they have the ultimate decision-making authority. Okay. So tell us what happens. Your argument is it's only the five-day that needs to be redone. The determination is what it is. So if we were to accept your argument and send it back, and then your argument would be you have to agree on a replacement for Manown. That's right. Okay. What if you can't? They just say, no, we don't like him. How about her? Oh, no, we don't like her. How about him? And you all just went on and on and on and on and never picked anybody. Then what? Well, the FAA says if there's an impasse or a breakdown in the process, then we go to court. So there's clear avenue under the case law and under federal law that allows for an appointment to be made. So this is not an insurmountable hurdle to getting a final determination award. We need a determination as well. We bargained for this process. And so we're just asking the court to hold YPF to its bargain and finish out the process as we've agreed to have the process concluded. You acknowledge, yeah, 9 U.S.C. 5 is what it would be. That's right. That's right. And, in fact, there are several cases that address that precise issue when there's been a breakdown in the process. And there's a significant footnote in the Poole Ray case where it says obviously the court recognized it wasn't possible to abide by the party's agreement. And so the solution was for the parties either to mutually agree to an alternative or to go to court and just have the district court handle the situation. That's your plan. You all try to agree, otherwise get the court. What if the court appoints the same person from KPMG that the KPMG? We'll have to cross that bridge when we get to it. But it's certainly not the person that we contemplated having resolve our dispute. But you would have no grounds to argue that, right? I mean, the court could do that. We don't know what the court will do. I mean, we could mutually agree to someone else entirely. No, I understand that. But if you can't agree, the court could appoint the same exact person. And that's how we'd be done. Yeah, I assume we're all going to be arguing to the court who that person ought to be. And it depends on who the, you know, who YPF proposes, who we propose. For what we know, it could be, you know, names of people we haven't even heard of yet in this litigation. But that's ultimately both the decision needs to be mutually made about who should step in and announce plays. And then ultimately, only those duly chosen arbitrators in conformance to the agreement can resolve the post-determination objections. And that's what we're asking this court to do, is to reverse and vacate the confirmation and send us back to arbitration. Just purely out of curiosity, why couldn't Ginger Benown have waited five days before resigning? Do we know? Actually, I mean, this may be sort of inferred from the record. But I think she contacted us on October 4th and said, I think it was a generic email saying, hey, by the way, I'm leaving KPMG. And we immediately went, whoa, whoa, whoa, whoa, whoa. You know, this is a problem for us. And then she immediately responded saying, no, I'm going to stay involved with the engagement. And then the determination wasn't sent to the parties until November. But it was predated October 5th, which was what she indicated was her last day at KPMG. And so we didn't know that she had really punched out because she told us she would stay on. And I guess she just moved on. And by the time we had the determination in our hands and an opportunity to sign off, she was no longer involved. But we didn't know that until we got the ruling on the determination or the post determination objections that was signed off by someone else. I get that this is not your fault. Just without a story, it's not her finest hour. No, I think that's significant, too, because one of the cases that YPF cites is an Eighth Circuit decision, Dow Corning. And the facts there are materially different because a party knew from the very And they sort of mounted a formal objection, but they thought, well, we'll just ride it out and see what happens. And so in that case, they decided to forego their ability to challenge the improper designation if it were indeed improper. We're not suggesting that you didn't act promptly on that. No. Thank you very much. I don't think the other side is suggesting that either. Thank you. Okay. Thank you. We have your argument. We appreciate both sides' arguments.